**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NOs.   **05-CR-80089-MARRA**
**07-CR-80128-MARRA**

**UNITED STATES OF AMERICA**

**vs.**

**RANDY CRAIG LEVINE,**

**Defendant.**
_____/

## PLEA AGREEMENT

The United States Attorney's Office for the Southern District of Florida ("this Office") and

Randy Craig Levine (hereinafter referred to as the "defendant") enter into the following agreement:

1.   The defendant agrees to plead guilty to Count Two of the Indictment in the case of

United States of America v. Randy Craig Levine, Case No. 05-CR-80089, which count charges

the defendant with perjury in violation of Title 18, United States Code, Section 1621.   This

Office agrees to seek dismissal of the remaining counts of the Indictment in Case No. 05-CR-

80089-Marra as to this defendant, after sentencing.

2.   The defendant agrees to plead guilty to Count 24 of the Indictment in the case of

United States of America v. Randy Craig Levine, Case No. 07-CR-80128, which count charges

the defendant with wire fraud in violation of Title 18, United States Code, Section

1343.   This Office agrees to seek dismissal of the remaining counts of the Indictment in Case

No. 07-CR-80128 as to this defendant, after sentencing.

3.   The defendant is aware that the sentence will be imposed by the Court after considering

the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing

Guidelines").   The defendant acknowledges and understands that the Court will compute an

advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be

determined by the Court relying in part on the results of a pre-sentence investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in paragraphs 1 and 2 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

4. The defendant also understands and acknowledges that, with regard to Count 2 of the Indictment in the case of United States of America v. Randy Craig Levine, Case No. 05-CR-80089, the Court may impose a statutory maximum term of imprisonment of up to five years, followed by a term of supervised release of up to one year, and a fine of up to $250,000. The defendant also understands and acknowledges that, with regard to Count 24 of the Indictment in the case of United States of America v. Randy Craig Levine, Case No. 07-CR-80128, the Court may impose a statutory maximum term of imprisonment of up to twenty years, followed by a term of supervised release of up to five years, and a fine of up to $250,000 or twice the gross gain or loss from the offense, whichever is greater. These sentences of imprisonment may be run consecutively, for a total sentence of twenty-five years imprisonment. The fines may likewise be

aggregated. In addition to a fine and terms of imprisonment and supervised release, the Court may order forfeiture and restitution.

5.   The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 4 of this agreement, a special assessment in the amount of $200 will be imposed on the defendant.   The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.   If a defendant is financially unable to pay the special assessment, the defendant agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

6.   This Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background.   Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

7.   This Office agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility.     Provided that the Court accepts the joint recommendations contained in paragraph 8, below, this Office will file a motion or otherwise request an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines. This Office, however, will not be required to make this motion or this recommendation if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have

3

misrepresented facts to the government prior to entering into this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

8.   This Office and the defendant agree that, although not binding on the probation office or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed:

(a) Joint Recommendations regarding Case No.05-CR-80089

(i) <u>Base Offense Level</u>:   That the base offense level is 14 pursuant to U.S. Sentencing Guidelines Section 2J1.3(a).

(ii) <u>Substantial Interference with the Administration of Justice</u>: The that defendant's offense conduct resulted in a substantial interference with the administration of justice, to wit, the unnecessary expenditure of substantial governmental resources to locate and extradite the defendant so that he could appear before the Court for both criminal cases.   Therefore, the defendant should receive a three-level increase pursuant to U.S. Sentencing Guidelines Section 2J1.3(b)(2).

(iii) <u>Adjusted Offense Level:</u> That the applicable adjusted offense level under all the circumstances of the offenses committed by the defendant in Case No. 05-CR-80089 is level 17, resulting in one-half unit for grouping purposes pursuant to U.S. Sentencing Guidelines Section 3D1.4.

(b) Joint Recommendations regarding Case No. 07-CR-80128

(i) <u>Loss</u>: That the relevant amount of actual, probable or intended loss resulting from the offense committed in this case is more than $250,000 but less than $550,000.   Therefore, the

4

defendant should receive a 12 level increase pursuant to U.S. Sentencing Guidelines Section 2B1.1(b)(1).

(ii) <u>Number of Victims, Use of Mass Marketing</u>: That the offense committed in this case involved 10 or more victims and was committed through mass-marketing. Therefore, the defendant should receive a two-level enhancement pursuant to U.S. Sentencing Guidelines Section 2B1.1(b)(2)(a).

(iii) <u>Use of Sophisticated Means, Relocation of Offense</u>: That the defendant relocated a fraudulent scheme giving rise to the charges offenses to another jurisdiction to evade law enforcement or regulatory officials; and that the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.   Therefore, the defendant should receive a two-level enhancement pursuant to United States Sentencing Guidelines Section 2B1.1(b)(10).

(iv) <u>Adjusted Offense Level</u>: That the applicable adjusted offense level under all the circumstances of the offenses committed by the defendant in Case No. 07-CR-80128 is Level 23, resulting in one unit for grouping purposes pursuant to U.S. Sentencing Guidelines Section 3D1.4.

(c) <u>Grouping and Combined Offense Level</u>:   That the defendant should receive a two-level enhancement to account for grouping the offenses committed in Case No. 05-CR-80089 and Case No. 07-CR-80128, pursuant to U.S. Sentencing Guidelines Sections 3D1.4 and 3C1.1, Application Note 8.   Therefore, the defendant's offense level prior any reduction for acceptance of responsibility is level 25.

(d) Additional Enhancements: If the Court accepts the joint recommendations contained paragraphs 8(a) through 8(c), and the defendant's adjusted offense level is at least 25

5

prior to any adjustment for acceptance of responsibility, this Office agrees not to seek the application of any additional enhancements to the defendant's offense level.

9. The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, this Office, or the probation office, is a prediction, not a promise, and is not binding on this Office, the probation office or the Court. The defendant understands further that any recommendation that this Office makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 3 above, that the defendant may not withdraw his/her plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, this Office, or a recommendation made jointly by the defendant and this Office.

10. This is the entire agreement and understanding between this Office and the defendant.

There are no other agreements, promises, representations, or understandings.

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

Date: ___5/17/2021___    By: _____

STEPHANIE EVANS
ASSISTANT UNITED STATES ATTORNEY

Date: ___5-17-21___    By: _____

JASON KREISS
ATTORNEY FOR DEFENDANT

Date: ___5.17.21___    By: _____

RANDY CRAIG LEVINE
DEFENDANT

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NOs.   05-CR-80089-MARRA**
**07-CR-80128-MARRA**

**UNITED STATES OF AMERICA**

**vs.**

**RANDY CRAIG LEVINE,**

**Defendant.**

_____/

## STIPULATED FACTUAL PROFFER IN SUPPORT OF THE GUILTY PLEA

COMES NOW, the United States of America, by and through its undersigned Assistant United States Attorney, and the defendant together with his counsel, and stipulate that the following shall constitute the underlying factual basis for entry of a plea of guilty to Count Two of the Indictment in Case No. 05-CR-8099-MARRA and Count Twenty-Four (24) of the Indictment in Case No. 07-CR-80128:

I, **RANDY CRAIG LEVINE,** hereby acknowledge that the Government could prove the following facts beyond a reasonable doubt:

From approximately 1999 through in or about July 2004, RANDY CRAIG LEVINE operated three internet web sites, www.baseballpicks.net, www.nflfootballpicks.tv and www.nbabasket-ballpicks.net, out of his home in Highland Beach, Florida. LEVINE registered the internet domains for these web sites and paid for their web hosting using a shell corporation, Pacific Oriental. Through these web sites, LEVINE purported to provide sports betting tips to individuals who registered with these websites or who called a telephone number listed on the website. LEVINE was the subscriber for the telephone numbers listed on the websites. LEVINE contacted the people who registered on these websites or who called the listed number and told them that if they sent funds to LEVINE, LEVINE would use the funds to open an offshore or Las

Vegas casino gambling account. LEVINE often used aliases and fake accents while talking to victims on the telephone. LEVINE used a cell phone with a 702 area code to make it appear as if he was calling from Las Vegas. LEVINE played a recording from a casino floor while he was on the phone with victims to make it sound as if he were calling from a casino. LEVINE further promised that account holder would be able to use the funds in these accounts to place bets on sporting events for their enjoyment and financial benefit.

While LEVINE purported to work out of Las Vegas, LEVINE often instructed victims to send money via Western Union to Boca Raton, Florida, using either his own name or the name of an alias or another individual who worked for LEVINE. LEVINE obtained fraudulent driver's licenses under his aliases to facilitate these money transfers. When another individual picked up the money from Western Union, this individual delivered the money to LEVINE and LEVINE paid the individual a percentage for this assistance.

At other times, LEVINE instructed victims to mail checks or cash to LEVINE's residence, to mailboxes rented by LEVINE, or to accomplices. Bank records show that accomplices L.B. and J.C. also received checks in their own name from victims, endorsed the checks, and signed them over to LEVINE. The checks were then deposited into LEVINE's personal account at Bank of America.

Although LEVINE received monies from his victims, LEVINE never opened the promised gambling accounts. Instead, LEVINE used the victims' monies for LEVINE's personal gain. In this manner, LEVINE defrauded more than 25 victims out of more than $500,000 (but less than $550,000). When the victims attempted to gain access to their money, or requested a refund, LEVINE strung them along, providing a myriad of excuses why the money could not be refunded. LEVINE often requested additional monies for processing fees or closing fees before the victim

2

could withdrawal their balance.  Victims often sent additional monies in an attempt to recover their initial investment, but none of the funds were ever returned to the victims. LEVINE would eventually stop answering victim's telephone calls or responding to their messages.

Among the victims of LEVINE's scheme was an individual known by the initials V.K. who lived in Woodland Hills, California.   In May of 2003 KAPADIA visited the web-site www.baseballpicks.net and left his contact information. On May 6, 2003, V.K. received a telephone call from a person identifying themselves as "MARIO FRICANO" who said he was calling from Las Vegas and who offered to set up an off-shore gambling account with Millennium Sports (Millsports) for V.K..   This telephone call came from a telephone assigned number 800-422-4395, the subscriber for which was RANDY LEVINE.   On May 7, 2003, V.K. sent an email from California to info@nflfootballpicks.tv, and email account controlled by Randy LEVINE in Boca Raton, Florida, which read, in relevant part:

> "I will be accepting a VIP platinum sports betting account per my discussion with Mario. The following is my info:
> …
> (Personal information redacted)
> …
> I will be wiring $7,000 from personal account today. I understand that my VIP Platinum account with Miillenium [sic] Sports will have a total credit balance of $16,200 (including all bonuses), upon receipt of my funds."

Later that same day, V.K. received a reply email from info@nbabasketballpicks.net, another email account controlled by Randy LEVINE, which read, in relevant part:

> "The following information is correct. Once our accountant receives the $7,000 from you, your account will be established and have a balance of $16,200. Also [name redacted] if you want an initial withdrawal let me know so I can put the request in. Look forward to working with you and building a long lasting relationship.
> Kind Regards,
> Randy"

3

On May 8, 2003, V.K. sent $7,000 from V.K.'s bank account at Citibank in Woodland Hills, California, to Randy LEVINE's bank account at Bank of America in Boca Raton, Florida, via interstate wire transfer.   "FRICANO" had provided V.K. with the wire transfer details and told V.K. that RANDY LEVINE was "FRICANO's" accountant.   V.K. also sent additional funds LEVINE via Western Union.   V.K. later realized that no gambling account had been established and that he had been defrauded.   V.K. was unable to get his money back.

On July 22, 2004, as part of the criminal investigation of LEVINE, the FBI executed a search warrant at LEVINE's residence.   Among the items seized from LEVINE's residence was LEVINE's U.S. Passport.   LEVINE was aware that his passport was seized by the FBI, as the passport was listed on the inventory of items seized.   LEVINE was provided a copy of this inventory, which LEVINE had reviewed and signed.   On July 27, 2004, five days after his U.S. passport was seized by the FBI, LEVINE applied for a replacement U.S. passport.   LEVINE knowingly made a false statement in this passport application by claiming his current passport had been lost, when in truth and fact, LEVINE knew that his passport had not been lost but had, in fact, been seized by the FBI.   LEVINE made this false statement under oath, to a person authorized to administer oaths.

On January 5, 2005, LEVINE, his attorney, an Assistant United States Attorney, and two FBI Special Agents met for a "reverse proffer", a meeting in which the Government revealed details of the fraud investigation against LEVINE, as well as some of the evidence uncovered during the investigation .   The United States also discussed the passport LEVINE had obtained following the FBI's search of his residence.   After the discussion, LEVINE agreed to continue the meeting at a date certain, at which time LEVINE would surrender the new passport.

4

Instead, LEVINE used this fraudulently obtained passport to flee the United States on January 6, 2005.

Three years later, in February 2008, LEVINE was arrested in Poland pursuant to an Interpol Red Notice.   However, complications arose because LEVINE had obtained his Polish citizenship on January 21, 2008.   This resulted in a lengthy legal process in the Polish court system to determine if a Polish citizen could be extradited to the United States.   In October 2011, after the Polish Constitutional Court ruled that LEVINE could be extradited to the United States, Polish authorities issued a summons for LEVINE.   LEVINE failed to appear and a warrant was issued for his arrest.   The government met with an attorney hired by LEVINE to discuss arrangements for LEVINE's self-surrender but these discussions were not fruitful.

In September 2017, the United States Marshals Service received an anonymous tip indicating that LEVINE was using the alias Viktor Lapin Borisovich (Lapin) and living in Tbilisi, Georgia.   The tip also indicated that LEVINE would be traveling to Guatamala City, Guatamala, using a Russian Passport under the Lapin alias.   From September 2017 until November 2019, U.S. authorities worked with INTERPOL and the Guatemalan authorities to arrest LEVINE when he traveled to through Guatamala using various aliases.   However, these efforts were not successful.

In May 2020, the FBI was notified that the Austrian Bundeskriminalamt Fugitive Active Search Team (BK FAST) had a fair level of certainty on a facial recognition match between LEVINE and someone who opened a bank account in Austria in March 2020 using a Mexican passport in the name of Alexander Martinez Lavrov.   The new alias was provided to INTERPOL Washington and an updated Red Notice was issued on June 5, 2020.   On June 9, 2020, BK FAST arrested Randy LEVINE in Graz, Austria.   At the time of his arrest, LEVINE possessed a passport under a new and different alias.    LEVINE later admitted that his real name was name was Randy

5

LEVINE. LEVINE did not contest his extradition to the United States to answer charges in the

Southern District of Florida in 05-CR-80089-MARRA and 07-CR-80128-MARRA

I, **RANDY CRAIG LEVINE**, am entering a plea of guilty to Count Two of the

Indictment in case number 05-CR-8099-MARRA,  which count charges me with perjury, in

violation of Title 18, United States Code Section 1621.  I understand and acknowledge that the

elements of this offense are as follows:

> First:       the Defendant took an oath before a competent person duly authorized and empowered to administer oaths that the declarations he had made were true;
>
> Second:    the Defendant, contrary to said oath, made statements which he then and there did not believe to be true;
>
> Third:      the false statements related to material matters; and
>
> Fourth:     the Defendant acted willfully and knowingly.

I, **RANDY CRAIG LEVINE**, admit that on or about July 27, 2004, at West Palm Beach,

Palm Beach County, in the Southern District of Florida, having duly taken an oath before a

competent person duly authorized and empowered to administer oaths, that the written declarations

I had made on my application for a United States passport were true, did willfully and knowingly

and contrary to said oath state material matters which I then and there did not believe to be true,

in that I stated under oath that my passport was lost, when in truth and in fact, and as I then and

there well knew, my passport was not lost; in violation of Title 18, United States Code, Section

1621.

I, **RANDY CRAIG LEVINE**, am entering a plea of guilty to Count Twenty Four of the

Indictment in case number 07-CR-80128-MARRA,  which count charges me with wire fraud, in

violation of Title 18, United States Code Section 1343.  I understand and acknowledge that the

elements of this offense are as follows:

| | |
|---|---|
| First: | the Defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises; |
| Second: | the false pretenses, representations, or promises were about a material fact; |
| Third: | the Defendant acted with the intent to defraud; and |
| Fourth: | the Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud. |

I, **RANDY CRAIG LEVINE**, admit that on May 8, 2003, for the purpose of executing and in furtherance of a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, I did knowingly and cause to be transmitted, by means of wire communications in interstate commerce, certain writings, signs, signals, pictures and sounds, as more particularly described as a wire transfer of $7,000 from V.K., in Woodland Hills, CA, via V.K.'s bank account at Citibank, to my bank account at Bank of America in Boca Raton, FL.

I, **RANDY CRAIG LEVINE,** admit that the statements contained in this factual proffer are true and correct.  I further acknowledge that I have reviewed this factual proffer with my attorney, Jason Kreiss, and am satisfied with the representation of my attorney in this matter.

7

I, **RANDY CRAIG LEVINE,** am pleading guilty to Count Two of the Indictment in case number 05-CR-8099-MARRA and Count Twenty Four of the Indictment in case number 07-CR-80128-MARRA because I am, in fact, guilty as charged.

Date: _5.17.21_     By: _____
                        RANDY CRAIG LEVINE
                        DEFENDANT

Date: _5-17-21_     By: _____
                        JASON KREISS
                        ATTORNEY FOR DEFENDANT

ACCEPTED:

                        JUAN ANTONIO GONZALEZ
                        ACTING UNITED STATES ATTORNEY

Date: _5/17/2021_     By: _____
                        STEPHANIE EVANS
                        ASSISTANT UNITED STATES ATTORNEY

8